UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: INTERNATIONAL MARINE, LLC | CIVIL ACTION |
| | NO. 07-6424<br>C/W: 07-6507 |
| | SECTION "L" (3) |

# FINDINGS OF FACT & CONCLUSIONS OF LAW

## I. PROCEDURAL HISTORY

This case arises out of a collision between two vessels, the M/V INTERNATIONAL TITAN and the M/V MISS KATHRYN, in the Calcasieu Pass near Cameron, Louisiana, on February 12, 2007. The INTERNATIONAL TITAN was owned by International Marine, and the MISS KATHRYN was owned by Graham Offshore, LLC, and operated by Seacor Marine, LLC. Plaintiff Paul Duet, a diesel mechanic, had completed repairs on one of the MISS KATHRYN's engines and was aboard the vessel at the time of the collision. He filed suit under the general maritime law against both International Marine and Seacor Marine seeking to recover damages for personal injuries he alleges he received as a result of the collision. International Marine filed a petition for exoneration from or limitation of liability. Graham Offshore, LLC, and Seacor Marine, LLC, filed claims in the limitation proceeding seeking recovery for damage to the MISS KATRHYN, and Paul Duet filed a claim for his damages. The personal injury complaint of Paul Duet and International Marine's petition for limitation were consolidated for trial before this Court. Shortly before trial, Paul Duet settled his claims against

Seacor Marine.

The matter came on for trial without a jury on March 2, 2009, and ended on March 4. After considering the testimony of the witnesses, the exhibits admitted into evidence, and the briefs submitted by the parties, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that a Finding of Fact constitutes a Conclusion of Law, the Court adopts it as such. Similarly, to the extent that a Conclusion of Law constitutes a Finding of Fact, the Court also adopts that assumption.

## II. FINDINGS OF FACT

**A. Liability**

(1)

Defendant and Petitioner in Limitation, International Marine, LLC, is a domestic corporation doing business within this judicial district and was the owner and operator of the M/V INTERNATIONAL TITAN.

(2)

Defendants/Claimants in the limitation proceeding Graham Offshore, LLC, and Seacor Marine, LLC, are foreign corporations doing business within this judicial district and were the owner and operator of the M/V MISS KATHRYN.

(3)

Plaintiff/Claimant, Paul Duet, was a person of the full age of majority, a resident of Louisiana, and at the time of the collision was employed by Cummins Mid-South, LLC, as a diesel mechanic and was assigned to work on the MISS KATHRYN.

(4)

Prior to February 12, 2007 the M/V MISS KATHRYN, which had recently been released from "cold storage," experienced mechanical problems with its number 3 and 4 main engines.

(5)

Seacor contracted with Cummins Mid-South to repair the M/V MISS KATHRYN's engines and, on February 12, Cummins dispatched its mechanic, Scott Martin, and his assistant, Paul Duet, to the Seacor dock in Cameron, Louisiana, to perform the work.

(6)

Scott Martin and Paul Duet repaired the M/V MISS KATHRYN's number 3 and 4 main engines. The engine repairs were then tested by dock trials, which consisted of securing the vessel to the dock and running the engines for 60-90 minutes.

(7)

During the dock trials, the M/V MISS KATHRYN's engines were operated at various speeds, including full throttle, and were placed under stress.

(8)

Following the conclusion of these dock trials, Scott Martin and Paul Duet felt that their engine repairs had been sufficiently tested and confirmed adequate.

(9)

Nevertheless, the captain of the MISS KATHRYN, Russell Clay Smith, decided to further test the engine repairs by conducting sea trials, which required the vessel to leave the dock and set out for the Gulf of Mexico. At that time, visibility was severely limited due to darkness and fog. There was neither any need nor urgency to conduct sea trials that evening. The MISS KATHRYN was off charter and there was no business or economic need to conduct

engage in sea trials. The crew could have safely conducted the sea trials the following morning.

(10)

Shortly before departing for sea trials on the night of February 12, 2007, Captain Smith discovered that his vessel's starboard navigation light was not functioning. Even this situation, however, did not deter him from conducting sea trials. Instead of waiting to conduct the sea trials the following morning, Captain Smith simply removed the navigational light bulb and replaced it with glow sticks that he had removed from life jackets aboard the MISS KATHRYN.

(11)

Prior to departing the dock with the M/V MISS KATHRYN, Scott Martin and Paul Duet notified Captain Smith that they did not feel that it was safe to conduct sea trials that evening. Rejecting this advice, Captain Smith ordered the vessel released from the dock and headed to the Gulf via the Calcasieu ship channel. Foggy conditions continued and grew increasingly worse as the MISS KATHRYN proceeded down the channel toward the jetties near the mouth. The credible evidence indicates that Captain Smith proceeded at nearly full speed as he moved the wheel quickly from side to side, resulting in erratic movements. Captain Smith did not post a lookout and failed to check the vessel's charts. In addition, he also failed to prepare a navigation passage plan as required by Seacor's Fleet Operation Manual.

(12)

As the MISS KATHRYN was proceeding toward the jetties, the M/V INTERNATIONAL MARINE, under the guidance of Captain James Brian McCauley, was returning to port in Cameron from a supply run and intended to proceed through the Calcasieu ship channel.

(13)

The INTERNATIONAL TITAN, however, was not equipped with a navigational chart of the Calcasieu channel. In addition to providing directions, this chart contains warnings that vessels traversing these waters should consider in planning their approach. Captain McCauley was not aware of specific warnings on the chart indicating that vessels should avoid meeting in situations within one-quarter mile north or south of lights 41 and 42 at the entrance to the Cameron jetties.

(14)

Moreover, on and before February 12, 2007, Captain McCauley's employer, International Marine, LLC, had in effect a company Fog Policy providing that if one of its vessels encountered fog that significantly reduced visibility, the vessel should immediately go to a safe location, anchor, and wait for conditions to improve before proceeding further. Captain McCauley testified that he was aware of his company's policy, but that on this occasion he violated it. Instead of proceeding to a safe location, he continued on in the direction of the channel notwithstanding increasingly heavy fog. Further, because Captain McCauley did not have the proper navigational charts on hand, it would have been difficult for him to locate a safe place to anchor even if he had chosen to do so.

(15)

As Captain McCauley approached the Cameron jetties, he reduced his speed because visibility had decreased to zero as a result of the fog. Captain McCauley observed the MISS KATHRYN approaching him on his radar and established radio contact with Captain Smith. At first contact, the captains agreed to a port-to-port passage, with the MISS KATHRYN holding up as the INTERNATIONAL TITAN passed. Because the INTERNATIONAL TITAN was

moving at a reduced speed, though, the captains agreed that the MISS KATHRYN would proceed ahead, with passage anticipated near the jetties.

(16)

Captain McCauley spotted the MISS KATHRYN on his radar and recognized that the vessel was fast approaching him. At that time, Captain McCauley did not know the appropriate fog signal for the INTERNATIONAL TITAN, and, consequently, did not sound his vessel's fog signal to alert Captain Smith of his presence. Proceeding at full speed, the MISS KATHRYN collided with the port side of the INTERNATIONAL TITAN and ended up partially lodged on the back deck of the INTERNATIONAL TITAN, where she remained until the current eventually separated the two vessels.

(17)

Captain Smith used the MISS KATHRYN's electronic chart and GPS system to obtain the exact latitude and longitude of the collision site, which he recorded in the Coast Guard Marine Casualty Report. These coordinates establish that, at the time of the collision, the INTERNATIONAL TITAN was on the wrong side of the Calcasieu ship channel. The coordinates indicate that the INTERNATIONAL TITAN was located to the west of the centerline, in the middle of the area through which the MISS KATHRYN had intended to pass. Apparently, Captain McCauley failed to take into account the westerly current, which had gradually pushed his slow-moving vessel to the west of the midline.

**B. Damages**

(1)

At the time of the collision, the Plaintiff, Paul Duet, was in the wheelhouse of the MISS

KATHRYN standing behind Captain Smith. He was holding onto a rail with both hands behind him. The force of impact caused him to lurch forward with his arms fully extended. Following the collision, the MISS KATHRYN and the INTERNATIONAL TITAN both made it back to the dock in Cameron. Paul Duet rode back to his home in Morgan City, Louisiana, with his co-worker, Scott Martin. During the ride, Mr. Duet complained to Scott Martin that his back was sore.

(2)

The next morning, Mr. Duet experienced considerable pain and had difficulty getting out of bed. He called and reported his condition to his employer and asked to see a doctor. His employer referred him to Dr. William Johnson. Mr. Duet saw Dr. Johnson on February 14, 16, 19, and 26, 2007, and was treated for pain in his cervical, lumbar, and thoracic spine.

(3)

Dr. Johnson referred Mr. Duet to Dr. Jeffery Fitter, an orthopedic surgeon, who examined him on February 21, 2007. Mr. Duet complained of severe neck pain. Dr. Fitter ordered an MRI of the cervical spine, which was done at the Imaging Center of South Louisiana on February 26, 2007. The MRI was interpreted by Dr. Wendy S. Gervais, who reported that Mr. Duet had a 3 millimeter right paracentral protruded disc herniation at C6-C7, producing mild narrowing of the central spinal canal as well as narrowing of the right neural foramen.

(4)

Based on his examinations of Mr. Duet on February 27, and March 13, 2007, Dr. Fitter felt that Mr. Duet's symptoms may have been caused by the disc rupture seen on the MRI. Accordingly, Dr. Fitter recommended that Mr. Duet continue conservative care, receive epidural injections, or possibly have surgical treatment for the herniated disc. During Mr. Duet's last

visit, Dr. Fitter noted that he complained of increased low back pain that was gaining in intensity. At that time, there was no radiation of pain in the legs. Dr. Fitter did not recommend surgery, though he recognized that it was a possibility.

(5)

Mr. Duet was also examined by a neurologist, Dr. Ranjit Patel, beginning on April 3, 2007. Dr. Patel performed electrodiagnostic tests that evidenced a bilateral L5-S1 radiculopathy, and right C7-T1 radiculopathy.

(6)

Paul Duet has also undergone examinations and treatment by Dr. Zoran Cupic, an orthopedic surgeon, beginning on May 11, 2007, and continuing through the present. After examining Mr. Duet and reviewing the past tests, Dr. Cupic diagnosed cervical strain, herniated nucleus pulposus at C6-C7, thoracic strain, lumbosacral strain, degenerative disc disease at L4-L5 and L5-S1 with a protrusion at L4-L5, and an impingement syndrome of the right shoulder. Dr. Cupic placed Mr. Duet on conservative treatment. This conservative treatment continued for over a year. When Mr. Duet's symptoms did not improve, Dr. Cupic ordered an MRI of his right shoulder and a discogram and post-discogram CAT scan of his lumbosacral spine. Based on these tests as well as continued examinations and treatment, Dr. Cupic concluded that Mr. Duet had bursitis and tendinitis with joint effusion, for which he recommended an arthroscopic decompression surgery that he estimated would cost about $18,000. With regard to Mr. Duet's low back, Dr. Cupic recommended a two-level laminectomy, discectomy and fusion of the lumbar spine, which he estimates would cost approximately $75,000. Finally, with regard to Mr. Duet's neck pain, Dr. Cupic recommended an anterior discectomy and fusion with instrumentation of his cervical spine, the cost of which would be about $60,000. Dr. Cupic

testified that, in his experience and based on statistics, if these procedures were done, Mr. Duet would have a 90% chance of having his pain alleviated or at least mollified to the point that, after a period of convalescence, he would be able to return to some form of gainful activity, albeit doing light work.

(7)

Paul Duet's date of birth is March 1, 1966. At the time of his injury on February 12, 2007, he was 41 years old. His remaining life expectancy is 34 years and his remaining work life expectancy is 18 years. He has a sixth grade education and for most of his work life he has worked as an engine mechanic, which generally requires heavy lifting, climbing, bending, reaching, and standing. Paul Duet's average income for the two years prior to his injury was $39,457.08. The credible economic testimony supports the conclusion that he will have past losses of income in the amount of $89,604.00, and a future loss, after commuting to present value and accounting for his returning to work making minimum wage, of $263,771.12. These amounts reflect after-tax losses.

(8)

Paul Duet has been in considerable pain since his injury and, with his impending surgical procedures, he is likely to face more pain in the immediate future and will in all likelihood have some pain or discomfort, loss of life's pleasures, and limitation in movement for the remainder of his life. In addition, he will need to undergo several surgical procedures in order to attempt to lessen the pain and improve his mobility. The evidence supports the conclusion that an appropriate amount for his past pain and suffering is $75,000, with $300,000 for his future pain and suffering. *See Broussard v. Stolt Offshore, Inc.*, No. 04-2471, 2007 WL 101041 (E.D. La. Jan. 9, 2007) (awarding $400,000 in general damages to plaintiff whose preexisting

spondylolisthetic condition was exacerbated while onboard vessel, resulting in residual pain, severe disability, and inability to perform routine daily tasks); *Daigle v. L & L Marine Transp. Co.*, 322 F. Supp. 2d 717 (E.D. La. 2004) (awarding plaintiff whose captain's chair collapsed on vessel $300,000 for pain and suffering for ongoing shoulder, neck, and back pain with reduced mobility); *Cameron v. United States*, 135 F. Supp. 2d 775 (E.D. Tex. 2001) (awarding plaintiff $350,000 in pain and suffering for career-ending injuries to neck, back, and wrist, requiring arthroscopic surgery, neck laminectomy, and probable future neck fusion); *Ates v. Mallard Bay Drilling, Inc.*, 01-0835 (La. App. 3 Cir. 12/12/01); 801 So. 2d 653 (awarding $200,000 for pain and suffering to plaintiff who fell into sitting position while carrying a heavy weight, resulting in permanent residual pain and limited mobility).

(9)

Seacor Marine was a claimant in the limitation proceeding and seeks to recover for the damage it sustained in the collision. The parties have stipulated that this amount is $74,293.70.

### III. CONCLUSIONS OF LAW

(1)

This consolidated case is within the admiralty and maritime jurisdiction of this Court pursuant to Rule 9(h) of the Federal Rules of Civil Procedure, Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims, and 28 U.S.C. §1333. Venue is proper in this judicial district. The applicable substantive law is the General Maritime Law, The Limitation of Liability Act, and the Longshoremen and Harbor Workers Compensation Act, 33 USC §901, *et. seq*.

(2)

The factual scenario set forth above reveals that both Captain McCauley and Captain Smith were negligent, and that their negligence proximately caused the collision between the M/V INTERNATIONAL TITAN and the M/V MISS KATHRYN on February 12, 2007, in the Calcasieu channel near Cameron Louisiana. With respect to Captain McCauley, he was negligent in violating his company's policy and proceeding in fog where the visibility was zero; in failing to have the proper navigational chart aboard his vessel; in not being aware of Coast Guard warnings which clearly appeared on the applicable navigational chart; in failing to know the proper fog signal and consequently failing to sound the fog signal; and in allowing his vessel to drift west of the midline of the channel such that he was on the wrong side of the channel at the time of collision. With regard to Captain Smith, he was negligent in leaving the dock in greatly decreased visibility conditions caused by fog; in failing to have working navigational lights; in speeding in zero visibility; in replacing his navigational light with glowsticks removed from the vessel's life vests; in moving the wheel from side to side at full speed, resulting in erratic movement; and in failing to post a lookout in reduced visibility. The Court apportions fault between these two vessels in the amount of 65% to the INTERNATIONAL TITAN and 35% to the MISS KATHRYN.

(3)

International Marine's claim for exoneration from liability is denied because, as described above, it and its employees were negligent and its vessel was at fault. *See Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir. 1977) (explaining that "[e]xoneration is contingent upon a finding of no contributory fault").

In addition to its claim for exoneration, International Marine as an alternative has made a claim for limitation of liability. The claim for limitation of liability is based on 46 U.S.C. § 30505, which provides that the liability of a vessel owner for any loss, damage, or injury caused by a collision, without the privity or knowledge of the owner, is limited to the amount or value of the interest of the owner in the vessel and her pending freight. Under this statute, International Marine and its insurer would be liable beyond the value of the INTERNATIONAL TITAN only if the vessel owner had privity and knowledge of the acts of negligence or faulty conditions which caused the plaintiff's injuries. *See Crown Zellerbach Corp. v. Ingram Industries, Inc.*, 783 F.2d 1296 (5th Cir. 1986); SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 15-6 (4th ed).

In the trial of a limitation proceeding, the burden of proof is divided between the petitioner and the claimants. The claimants must first prove that the damage was caused by the negligence of the vessel owner or an unseaworthy condition of the vessel. In this case, the claimants have met the burden. As a result, the burden shifts to the shipowner to demonstrate that it had no privity or knowledge of the fault. Privity or knowledge exists where the owner has actual knowledge or could have and should have obtained the necessary information by reasonable inquiry or inspection. This is basically a "reasonable man" test. Moreover, for purposes of establishing privity or knowledge regarding limitation as to personal injury and death claimants, the privity or knowledge of the master of the vessel at or before the beginning of each voyage is deemed conclusively the privity or knowledge of the owner. *See* 46 U.S.C. § 30506; *see also Trico Marine Assets, Inc. v. Diamond B Marine Servs. Inc.*, 332 F.3d 779, 789-90 (5th Cir. 2003) ("[I]n situations resulting in loss of life or bodily injury, the knowledge of a seagoing vessel's master at the commencement of a voyage is imputed to the vessel's owner.");

*Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1473-74 (5th Cir. 1991) ("[A] shipowner has privity if he personally participated in the negligent conduct or brought about the unseaworthy condition. Knowledge, when the shipowner is a corporation, is judged not only by what the corporation's managing officers actually knew, but also by what they should have known with respect to conditions or actions likely to cause the loss.")

Based on the evidence in this case, International Marine's claim for limitation is denied because it had privity and knowledge of the fault at issue. At the commencement of the voyage, Captain McCauley of the INTERNATIONAL TITAN did not have the proper navigational charts on the vessel and did not have access to warnings specifically intended for vessels navigating the Calcasieu channel where the collision took place. International Marine either knew or should have known that its vessel did not have these navigational charts, which were essential to the voyage at issue, particularly given the inclement weather conditions. Had International Marine provided its captain with the appropriate materials to navigate the channel, Captain McCauley may have been aware of the warnings and avoided crossing at the site of the collision, or would have at least had the option of anchoring in a safe place to wait for the fog to clear. In addition, International Marine also failed to provide Captain McCauley with proper training necessary to navigate in heavy fog, particularly with regard to how and when to sound the fog horn. Had Captain McCauley properly sounded the fog horn, Captain Smith aboard the MISS KATHRYN may have been alerted to the INTERNATIONAL TITAN's presence on the wrong side of the channel.

(5)

The injuries and resultant damages sustained by Paul Duet were proximately caused by the negligence or fault of International Marine and Seacor Marine in the above-mentioned

proportions. The damages sustained by Paul Duet are as follows:

  (1) Past wage loss: $89,604

  (2) Future wage loss: $263,771.12

  (3) Past medical expenses: $28,760

  (4) Future medical expenses: $180,000

  (5) Past pain and suffering: $75,000

  (6) Future pain and suffering: $300,000

(6)

Seacor's vessel, the MISS KATHRYN, sustained damage as a result of the collision in the amount of $74,293.07. Seacor is entitled to receive from International Marine 65% of that sum, or the amount of $48,290.50.

## Pre-Judgment Interest

In admiralty cases, the award of prejudgment interest is discretionary with the court, but is normally awarded unless specific circumstances are present that would make the award inequitable. The rate of prejudgment interest, as well the date from which it accrues, is also discretionary with the court. *See* SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5-21 (4th ed.). However, prejudgment interest is not allowed on future damages. *See Martin v. Walk Hadel, & Assoc.*, 794 F.2d 209 (5th Cir. 1986). The Court finds that an award of pre-judgment interest is warranted on the Plaintiff's past damages at the rate of 5.5% from the date of the collision. The Court does not feel that it is appropriate for Seacor to receive prejudgment interest on its losses because its vessel, the MISS KATHRYN, was partially at fault in causing the collision.

**Summary**

On the basis of the above Findings of Fact and Conclusion of Law, the Court finds that the Plaintiff, Paul Duet, sustained damages due to the negligence of International Marine, LLC, and Seacor Marine, LLC, in the proportion of 65% to International Marine and 35% to Seacor Marine in the following amounts:

(1) Past wage loss: $89,604

(2) Future wage loss: $263,771.12

(3) Past medical expenses: $28,760

(4) Future medical expenses: $180,000

(5) Past pain and suffering: $75,000

(6) Future pain and suffering: $300,000

The plaintiff is entitled to prejudgment interesting at the rate of 5.5% on the above mentioned past losses, totaling $193,364, from the date of the collision until paid. In addition, the plaintiff is also entitled to interest at the judicial rate on all future damages, totaling $743,771.12, from date of judgment until paid. Because the plaintiff settled all of his claims against Seacor prior to trial, the above apportionment of damages is applicable only as to the plaintiff's remaining claims against International Marine.

Furthermore, Seacor is entitled to recover 65% of its loss, or $48,290.50, from International Marine, plus interest at the judicial rate from the date of judgment.

New Orleans, Louisiana, this 1st day of May, 2009.

_____
UNITED STATES DISTRICT JUDGE